UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TELITHA L. CLEMENTS,

                    Plaintiff,                                   No. 11-cv-13340

vs.                                                             Hon. Gerald E. Rosen

PRUDENTIAL PROTECTIVE
SERVICES, LLC,

                    Defendant.
_____/

OPINION AND ORDER REGARDING PLAINTIFF'S MOTION FOR
LIQUIDATED DAMAGES, ATTORNEYS' FEES, COSTS AND INTEREST

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on April 27, 2015

PRESENT:   Honorable Gerald E. Rosen
                    United States District Chief Judge

## I. INTRODUCTION

This Family and Medical Leave Act case was tried before a jury in November

2014.  At the conclusion of the four-day trial, the jury returned a verdict in favor of the

Plaintiff and awarded her $31,000.00 as compensatory damages.  This matter is now

before the Court on Plaintiff's post-trial motion for liquidated damages, attorneys' fees

and costs, accrued pre-judgment interest and post-judgment interest.  Defendant

responded in opposition to Plaintiff's Motion, to which response Plaintiff replied.  The

Court heard oral argument on this matter on March 30, 2015, and at the conclusion of the

1

hearing, took the matter under advisement.

Having had the opportunity to review the parties' briefs, supporting documents, and the entire record of this matter, and having reviewed and considered the oral arguments of counsel, the Court is now prepared to rule on this matter.  This Opinion and Order sets forth the Court's decision.

## II.  DISCUSSION

### A.    LIQUIDATED DAMAGES

Section 2617 of the Family and Medical Leave Act (the "FMLA"), 29 U.S.C. § 2617,  provides, in relevant part:

> An employer who violates section 2615 of [the statute] shall be liable to any eligible employee affected
>
> (A) for damages equal to --
>
> > (i) the amount of--
> >
> > > (I)  any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation; or
> > >
> > > (II)  in a case in which wages, salary, employment benefits, or other compensation have not been denied or lost to the employee, any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care, up to a sum equal to 12 weeks (or 26 weeks, in a case involving leave under section 2612(a)(3) of this title) of wages or salary for the employee;
> >
> > (ii)    the interest on the amount described in clause (i) calculated at the prevailing rate; and

2

> (iii) **an additional amount as liquidated damages equal to the sum of the amount described in clause (i) and the interest described in clause (ii),** *except that if an employer who has violated section 2615 of this title proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title,* **such court may, in the discretion of the court, reduce the amount of the liability to the amount and interest determined under clauses (i) and (ii), respectively.**

29 U.S.C. § 2617(a)(1)(A) (emphasis added).

As provided in the statute, "any employer found to have violated the FMLA '*shall be liable*' to the affected employee for lost wages, interest, and 'an additional amount as liquidated damages equal to the sum of the amount' of lost wages and interest." *Hernandez v. Bridgestone Americas Tire Operations*, *LLC*, ___ F. Supp. 2d ___, No. 4:13–cv–00374, 2015 WL 1600595 at *1 (S.D. Iowa Mar. 17, 2015) (quoting  29 U.S.C. § 2617(a)(1)) (emphasis added); *see also Newcomb v. Corinth School Dist.*, 2015 WL 1505839 at *13 (N.D. Miss. Mar. 31, 2015) (Under the FMLA, a plaintiff "is entitled to liquidated damages, which equal 'an additional amount in the sum of' damages awarded for lost compensation plus interest. 29 U.S.C. § 2617(a)(1)(A)."); *Williams v. Illinois Department of Corrections*, 2007 WL 2316476 (S.D. Ill. Aug. 13, 2007) ("The FMLA provides that an employer who violates the action shall be liable for liquidated damages equal to the sum of the employee's lost wages and the interest on that award").

"[L]iquidated damages are not punitive in nature but are designed to compensate

3

employees for the retention of their pay." *Firth v. Don McGill of West Houston, Ltd.*,
2006 WL 846377 at * 1 n.2 (S.D. Tex. Mar. 28, 2006), *aff'd*, 233 F. App'x 346 (5th Cir.
2007) (citing *Snapp v. Unlimited Concepts, Inc.*, 208 F.3d 928, 934 (11th Cir. 2000);
*Thorson v. Geminin, Inc.*, 96 F. Supp. 2d 882, 890-91 (N. D.Iowa 1999), *aff'd*, 205 F.3d
370 (8th Cir. 2000) ( citing *Roy v. County of Lexington*, S.C., 141 F.3d 533, 548 (4th
Cir.1998) ("Liquidated damages are considered compensatory rather than punitive in
nature."); *Reich v. S. New England Telecomm. Corp.*, 121 F.3d 58, 71 (2d Cir.1997)).
Liquidated damages are not a disfavored penalty; they are "'the norm, not the
exception.'" *Thorson, supra* ( quoting *Shea v. Galaxie Lumber & Constr. Co., Ltd.*, 152
F.3d 729, 733 (7th Cir.1998)).

The "Good Faith" Exception to Liquidated Damages

As the statute makes clear, there is a strong presumption in favor of awarding
liquidated damages, *Thom v. Am. Std., Inc.*, 666 F.3d 968, 977 (6th Cir. 2012), and a
court may not exercise its discretionary authority to reduce or eliminate liquidated
damages unless the employer first sustains its burden to prove "to the satisfaction of the
court" *both* that it acted in good faith *and* that it had reasonable grounds to believe its
actions did not violate the statute. *Arban v. West Publishing Corp.*, 345 F.3d 390, 407-08
(6th Cir. 2003).  It is not the employee's burden to disprove the employer's good faith;
rather the employer bears the "substantial burden" of proving its good faith and
reasonableness. *Nero v. Ind. Molding Corp.* 167 F.3d 921, 933, n.3 (5th Cir. 1999).

4

Further, the court must exercise its discretion "'consistently *with the strong presumption in favor of doubling.'"* *Thom*, 666 F.3d at 976 (quoting *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002)) (emphasis supplied).

As the courts have noted, the FMLA does not define "good faith." *See Arban, supra*, 345 F.3d at 407; *Nero*, 167 F.3d at 928; *Jordan v. United States Postal Serv.*, 379 F.3d 1196, 1201-02 (10th Cir. 2004). However, because of the substantial similarity of the remedial provisions in the FMLA to those in the Fair Labor Standards Act (FLSA), the Sixth Circuit and numerous other circuits look to the FLSA for guidance in interpreting the FMLA. *See e.g., Arban*, 345 F.3d at 407; *Nero*, 167 F.3d at 928; *Jordan*, 379 F.3d at 1201. As the *Arban* court noted, both the FMLA and the FLSA provide that an employer "shall" be liable for damages and liquidated damages and that the district court "may" reduce the amount of liquidated damages if good faith is established. See 29 U.S.C. § 216(b) (providing damages under the FLSA); *id*. at § 260 (providing good faith defense to liquidated damages under FLSA); *id.* at § 2617(a) (FMLA). "[T]he legislative history of the FMLA reveals that Congress intended the remedial provisions of the FMLA to mirror those in the FLSA." *Frizzell v. Southwest Motor Freight*, 154 F.3d 641, 644 (6th Cir. 1998) (citing S.Rep. No. 103-3, at 35 (1993), reprinted in 1993 U.S.C.C.A.N. 3, 37 ("[The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA.... The relief provided in FMLA also parallels the provisions of the FLSA.")).

5

Consistent with judicial interpretation of the damages provisions of the FLSA, the Sixth Circuit has held that to establish good faith under the FMLA, a defendant must show that "it honestly intended to ascertain the dictates of the FMLA and to act in conformance with it." *Thom v. Am. Std., Inc.*, 666 F.3d at 977 (quoting *Hite v. Vermeer Mfg. Co*., 446 F.3d 858, 868 (8th Cir. 2006)).  *See also Reich v. S. New England Telecomm. Corp*., *supra,* 121 F.3d at 71 (FLSA context) (an employer should demonstrate that it took "active steps to ascertain the dictates" of the FLSA and attempted to comply with the statute.)  The determination of whether an employer has sufficiently shown it acted in good faith, thus, includes an analysis of both whether the employer had a subjective intent to comply with the FMLA and whether it acted objectively reasonably in its application of the FMLA.  *See Castro v. Chicago Hous. Auth*, 360 F.3d 721, 730 (7th Cir. 2004).  The subjective component involves an employer's "honest intention to ascertain what the [FMLA] requires and to act in accordance with it."  *Friedman v. S. Fla. Psychiatric Assocs., Inc.*, 139 F. App'x 183, 185-86 (11th Cir. 2005).  The objective component considers the employer's "reasonable grounds for believing its conduct comported with the [FMLA]."  *Id.*

Defendant here contends it had a good faith belief that it was not violating the provisions of the FMLA.  As evidence, it points to the trial testimony of Patricia Guzik, the owner of Prudential Protective Services, that Prudential has never before been sued for violation of the FMLA and that, although the company kept no records of who was

6

granted FMLA leave, for what purposes, or for how long, she knew who was working and who was not.  Based on this general knowledge, she estimated that 50 or more employees went on leave each year. She further pointed to the fact that Plaintiff Telitha Clements herself had previously taken FMLA a few years prior the leave time at issue in this case.

Ms. Guzik, however, had no answer when confronted with the testimony of Lamont Lively, Plaintiff's former supervisor, who testified he had received no training in the FMLA from Prudential, even after this lawsuit was commenced, and Ms. Guzik's testimony that her company acted in accordance with the Act is entirely circular.  Guzik's testimony was as follows:

> Q (by Plaintiff's counsel):  What I'm asking you is, Mr. Lively was the day-to-day supervisor of the employees, correct?
>
> A (by Ms. Guzik):   Correct.
>
> Q:       He scheduled them, correct?
>
> A:        Correct.
>
> Q:       He worked with them, he worked with their problems, medical appointments, things like that. Correct?
>
> A:       That's correct.
>
> Q:       If he had no knowledge that the FMLA even existed, how could he provide them appropriate responses to the information that they provided directly to him regarding their personal family needs?
>
> A:       If Mr. Lively had no knowledge whatsoever of FMLA and employees rights thereunder, then how could he have had so many go out on maternity

leave, including ones previous from Ms. Clements. He, obviously, was aware.

He did, also, know to direct those employees to the office. . . .

Q:     So your answer is based on his actions in allowing females to take maternity leave, correct?

A:     I'm using that as an example. . . .

Q:     You don't know if other persons came to him requesting military leave or leave to care for family members if he was even able to respond appropriately, correct?

A:     I'm sure there were other individuals.

Q:     You have no personal knowledge of that, though, do you?

A:     Off the top of my head, I cannot think of specific examples. . . .

Q:     That [Lively was able to respond appropriately to all leave requests is] a complete assumption on your part, actually, though, isn't it?

A:     No, it's not.

Q;     Your testimony is that because Ms. Clements was provided an FMLA leave for maternity leave, then Mr. Lively did comply with FMLA, correct? Because she was not actually terminated. . .  because. . . she had a baby, Mr. Lively must have complied with the FMLA, correct? That's your testimony?

A:     Ms. Clements has -- was never terminated for not showing up for work. . . .

***

Q:     Your testimony is that because Ms. Clements was not terminated for not coming to work because she had a baby, Mr. Lively complied with FMLA, correct?

A:     My testimony is that because Ms. Clements was not terminated for not coming to work and because Ms.Clements was offered another position

8

when she did come into the office that day, and because Mr. Lively instructed her to come into the office for repositioning after explaining that there was nothing there due to budget cuts, that she was in no way prejudiced for or against her maternity leave.

Q:     That is all in reference to her second pregnancy, correct?

A:     First and second.

***

Q:     And for her first pregnancy, her testimony is that she was ready to return after six weeks but was not placed back on the schedule for, approximately, two months. You heard that, correct?

A:     That's what I heard, yeah.

Q:     If that is the case, then FMLA was not complied with in that case either, was it?
         . . . What I want to know, though, is if [Ms. Clements] had to wait two months to come back to the New Center and was not returned to work by Prudential at another site because Mr. Lively didn't know to call the office and say I have someone back from FMLA Leave, can you have someone call them and offer them a job here, isn't that also a violation of FMLA?

A:     Can you repeat your question, please?

Q:     Sure.

         If she's ready to return after six weeks from the birth of her first child and she's waiting to come back to work with Mr. Lively for two months and he doesn't know that she has a right to be returned to work so he has no way of knowing to call the office and say I've got someone who's on maternity leave. I think this is an FMLA issue. You guys need to contact her, offer her a new job. Isn't that also a violation of FMLA?

A:     I'm sorry. Can you ask that in a different way?

Q:     No. I'll move on.
         You're placing the burden on Ms. Clements in this case, aren't you?

9

A:    I'm merely defending myself in this case or my company in this case.

Q:    And it's your contention that Mr. Lively's 'go to the office' should have been enough for her to go and ask for reassignment, correct?

A:    It's my contention when she was in the office. . . , if offered placement when she came to fill out her form and request a letter stating she was laid off, that's when we fulfilled our obligation.

[Tr. Vol. 3, pp. 128-133.]

As indicated, Lamont Lively testified that, as a supervisor, he had been given no policies or manuals to follow regarding the FMLA; in fact, he testified that he did not even know what the FMLA was. [Tr. Vol. 2, pp 32-33.] A showing of good faith requires more than ignorance of the law. *Reich*, *supra*, 121 F.3d at 71. Lively did not concern himself with not knowing about the law. He testified that he never gave Clements any FMLA forms to fill out, [Tr. Vol. 2 at p. 49]; he just "probably told her let them know at the office she's going on maternity leave." *Id.* at p. 31. He "presumed she called [the office]" and "told them she wanted to go on maternity leave." *Id.* at 32. He simply assumed "the office would set all that up." *Id*.

Matthew Keywell, the company vice-president responsible for personnel, also admitted that Prudential managers were not provided with any training or direction on the requirements of the FMLA. [Tr. Vol. 3, p. 14.] He further admitted that the company does not provide any handbook or handouts informing employees of the FMLA privileges they are allowed. *Id*. at p. 10. However, he testified that he believed that all employees were provided with sufficient information because the company posted

10

posters of all of the federal regulations, including the FMLA:

Q:     Once an employee arrived at your office, it's your testimony that they were
       directed to do, you didn't have employees sitting at the front desk who had any
       training in FMLA, did you?

A:     Again, everybody has a general knowledge due to the posters.
                 Most of the law speaks for themselves as far as equal opportunity and
       FMLA, minimum wage.
                 They're all general knowledge items that anybody working in this field
       does know.

Q:     General knowledge items?

A:     Correct.

Q:     And the young women working at the front desk have general knowledge of
       FMLA do [sic] to reading the posters?

A:     Correct.

Q:     Have you ever required them to read the posters?

A:     Everybody does during orientation. It's talked about. It's a subject.

Q:     Now other than reading the posters, young women at the front desk didn't have
       any training in FMLA, did they?

A:     Specifically other than that, I'd call that training.

[Tr. Vol. 3, pp. 17-18.]

       The Court finds Defendant's proffered evidence wholly insufficient to establish a

good faith intent to ascertain the dictates of the FMLA and to act in conformance with it.

It is the defendant's burden to establish good faith, and Defendant Prudential has failed to

meet this burden.

It is not that the Court finds anything malignant in Defendant's actions; rather it was Defendant's casual, cavalier manner of dealing with its statutory obligations which leads the Court to conclude that Defendant failed to demonstrate good faith.  Mr. Keywell's testimony exemplifies this casualness.  He testified that he believed that all Prudential employees should have a sufficient "general knowledge" of what their rights and obligations are under the FMLA because there are posters posted on the premises concerning the federal labor laws.  Yet, Keywell admitted he did not know exactly where these posters were located or even what version of the FMLA was posted.

Mr. Lively similarly was all too casual.  He had no training on the law's requirements.  He had been given no instruction as to the rights of his subordinates upon their return from an FMLA leave.  Rather he testified his actions were based on what he believed was "fair."  Without any knowledge of the statutory requirements, how could Mr. Lively know he handled FMLA leave requests and reinstatements in compliance with the law?

Not only has Defendant failed to satisfy the subjective components of good faith, but also it has failed to demonstrate satisfaction of the objective component of establishing reasonable grounds for believing its conduct comported with the FMLA.  In this regard, the Court finds particularly troubling Defendant's last ditch efforts at trial to discredit Plaintiff by accusing her of falsifying a letter confirming Prudential's denial of her return to a position following the conclusion of her leave -- when, in fact, the

12

evidence established that it was Defendant's employees who drafted the letter and provided to her.

Based upon the above actions of Defendant and the testimony of Defendant's witnesses, the Court concludes that Defendant has failed to meet its burden of proving its good faith and reasonableness such that the Court should disregard the statutory presumption in favor of awarding liquidated damages. Therefore, in accordance with 29 U.S.C. § 2617(a)(1)(A)(iii), the Court will award Plaintiff liquidated damages in an amount equal to the sum of the amount of damages awarded by the jury plus interest on that award. The calculation of the amount of liquidated damages is discussed more fully following the discussion of the calculation of pre-judgment interest in Part D, *infra*.

B.   ATTORNEYS' FEES

Plaintiff also seeks an award of $85,815.00 for attorneys' fees for 391 hours of attorney and paralegal time.

The FMLA provides that the court, "*shall*, in addition to any judgment awarded to the plaintiff, allow a *reasonable* attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3) (emphasis added). Unlike other civil-rights statutes, where attorneys' fee awards are discretionary, *see, e.g.*, 42 U.S.C. § 1988, a plaintiff prevailing under the FMLA is statutorily entitled to his reasonable attorney's fee. Despite this difference, "courts have analyzed motions for attorney's fees under the FMLA in the same way as motions for attorney's fees under

13

other civil rights statutes." *Bell v. Prefix, Inc*., 784 F. Supp. 2d 778, 781 (E.D. Mich. 2011) (citation omitted).

"The most useful starting point for determining the amount of a reasonable fee is the number of hours *reasonably* expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933 (1983) (emphasis added). As the *Hensley* Court explained:

> This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
>
> The district court should also exclude from this initial fee calculation hours that were not "reasonably expended." . . . Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary. . . .
>
> The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." This factor is particularly crucial where a plaintiff . . . succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?
>
> In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants -- often an institution and its officers, as in this case -- counsel's work on one claim will be unrelated to his work on another. Accordingly,

14

work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." . . . .

 It may well be that cases involving such unrelated claims are unlikely to arise with great frequency.  Many civil rights cases will present only a single claim.  In other cases the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories.  Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis.  Such a lawsuit cannot be viewed as a series of discrete claims.  Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

 Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified.  In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. . . . Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters.

 If, on the other hand, a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times an hourly rate may be an excessive amount.  This will be true even where the plaintiff's claims were interrelated, nonfrivolous, and raised in good faith.  Congress has not authorized an award of fees whenever it was reasonable for a plaintiff to bring a lawsuit or whenever conscientious counsel tried the case with devotion and skill.  Again the most critical factor is the degree of success obtained. . . .

 . . . There is no precise rule or formula for making these determinations.  The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success.  The court necessarily has discretion in making this equitable judgment.  This discretion, however, must be exercised in light of the considerations we have identified.

461 U.S. at 433-37, 103 S.Ct. at 1939-41 (citations omitted).

The Sixth Circuit has approved the court's consideration of the twelve factors first enunciated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), when exercising its discretion with regard to fee requests. *See Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir.1999). The *Johnson* factors are:

> (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of *782 the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

488 F.2d at 717–19.

The Court will apply the foregoing standards in determining the amount of Plaintiffs' award of attorneys' fees in this case.

First, the parties have not provided a very in depth review of the *Johnson* factors. The Court will not address each factor in great detail. However, it will briefly summarize the facts and happenings relevant to its award of attorney's fees.

1. The *Johnson* Factors

It first bears noting that this case spanned three years from the date of filing to the entry of the jury verdict. Plaintiff's original attorney at the Burgess & Sharp law firm was Heidi Juntilla. She left the firm in early 2012 and Heidi Sharp took over primary

16

responsibility for the case. This required that Ms. Sharp quickly familiarize herself with all of the facts and evidence adduced during discovery and prepare a response to Defendant's motion for summary judgment.

The Court granted Defendant's motion for summary judgment in March 2013 after which Ms. Sharp filed Plaintiff's appeal. This, of course, entailed additional briefing and oral argument. The appeal was decided in February 2014. The Sixth Circuit remanded the case back to this Court where, after several unsuccessful attempts at settlement, it culminated in a four-day jury trial in November 2014.

Although the FMLA is a broad and complicated statute, Defendant argues that this case, including the key issues on appeal, centered on two discrete factual disputes: Whether Plaintiff suffered prejudice as to her right under the FMLA to return to her previous position or an equivalent position after taking leave, and specifically whether Defendant in fact laid her off rather than reassign her to another security job. Contrary to Defendant's assertions, the case required better than average legal skills, and included substantive motion practice, appellate briefing and oral argument presentation, and trial skills. Attorney Sharp exhibited those skills.

Plaintiff also contends that the Ms. Sharp "had to turn down other cases in order to prosecute" this case. However, no evidence to support this contention has been submitted to the Court, and a cursory review of only the Eastern District of Michigan docket undermines this assertion. From the date of filing of Clements' Complaint through the

17

date of completion of the trial, the docket of this Court shows that Ms. Sharp filed at least 24 other cases in this court alone.  Obviously, she did not have to turn down other cases to prosecute this case.

Plaintiff also represents that there was a contingency-based fee agreement.  The Court, however, was not provided with a copy of such agreement, but it is standard that the agreement would call for a portion of any damages award to be paid to Plaintiff's attorneys, and Plaintiff does not explain in her brief how the statutory award of fees will interplay with her contingent fee agreement.  Finally, there is no evidence that Plaintiff enjoyed a professional relationship with her counsel prior to this case.

Defendant focuses much of its opposition brief on the amount of success Plaintiff achieved in this litigation.  Defendant points out that in the parties' private mediation, Plaintiff demanded $185,000.00, yet the jury only awarded her $31,000.00.  Plaintiff, however, represents that the amount demanded at mediation was a "global" demand that encompassed both compensatory and liquidated damages, as well as fees and costs and interest.  At trial Plaintiff requested $89,529.72 in damages. There were discussions before the commencement of and during trial to resolve this matter for $35,000.00.   The Court itself recalls that prior to trial, the Court tried to settle this case for $27,500.00. The jury awarded only $31,000.00.  However, given the presumptive doubling of damages ages pursuant to the FMLA's liquidated damages provision, the Court does not find a reduction of fees warranted based upon Plaintiff's lack of success in obtaining a larger

18

award from the jury.  $62,000.00 is certainly more than the damages discussed in the

parties' last settlement discussions and approximately 70% of the amount Plaintiff asked

the jury to award.[1]  Therefore, the Court will not reduce Plaintiff's attorneys' fees simply

for a lack of success.

2.  <u>Reasonableness of the Attorneys' Hourly Rates and the Number of Hours Expended</u>

The FMLA's attorney-fee provision requires that the attorneys' fees be awarded at

a reasonable rate.  *See* 29 U.S.C. § 2617. "[A] reasonable hourly rate should be sufficient

to encourage competent lawyers in the relevant community to undertake legal

representation." *Bell v. Prefix, supra*, 784 F. Supp. 2d at 783 (quoting *Lamar Adver. Co.*

*v. Charter Twp. of Van Buren*, 178 F. App'x. 498, 501–02 (6th Cir.2006) (citing *Blum v.*

*Stenson*, 465 U.S. 886, 894–94, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

Plaintiff's attorneys seek a fee award based on the following hourly rates:  $250

per hour for Heidi Sharp and Rex Burgess; $200 per hour for the time billed by associates

Monika Singh and Heidi Juntilla; $165 per hour for associate Zachary Hallman; and $95

per hour for paralegal work.

Heidi Sharp has been practicing law for 9 years.  She and Rex Burgess, who has

been practicing for 26 years, own and operate the Burgess & Sharp law firm.  The firm

---

[1]  The Court emphasizes here that its discussion of settlement negotiations is not
raised to imply that either party should have settled the case, or that Defendant should in
any way be penalized for not settling, but rather only for the purpose of showing
Plaintiff's relative success in the case, and her perseverance and that of her attorney in
pursuing her claims through to the end.

also employs two associates and one senior counsel.  Heidi Juntilla worked for the firm

from 2007 until 2012.  The first two and a half years she worked as a law clerk; she

began working as an associate after she passed the bar in May 2009.  Monika Singh also

has five years' practice experience:  like Ms. Juntilla Ms. Singh has been practicing since

2009.  Zachary Hallman was admitted to practice law in May 2014, i.e., only a few

months before the trial in this case.

The State Bar of Michigan's 2014 Economics of Law Practice Survey ("the

Survey") indicates that the median billing rate for attorneys with 6-10 years of practice

experience is $225 per hour.  (The rate is $310 for equity partners.)  The median billing

rate for associates is $208 per hour. Michigan federal courts routinely use the Survey as

evidence of reasonableness in determining attorneys' fees.  *See Bell v. Prefix, supra*; *see

also Int'l-Matez Tank Terminals-Ill. v. Chemical Bank*, 2010 WL 3238917, at *6 (W.D.

Mich. Aug. 16, 2010); *Meyer v. Macomb Twp. of Macomb Cnty*., 2010 WL 891268, at *2

n. 3 (E.D. Mich. Mar. 10, 2010).  $250 per hour is the regular billing rate of Heidi Sharp

and Rex Burgess.  Ms. Singh and Ms. Juntilla's regular rate was $200 per hour, and Mr.

Hallman's regular rate is $165 per hour. The Court finds that counsels' hourly rates are

reasonable for this type of representation and will sufficiently encourage competent

representation in FMLA cases in this community.  The Court further finds that the 391

hours for which Plaintiff seeks fees is well within the realm of reasonableness.

Defendant, however, asks that the Court reduce the amount of  time for which fees

20

are sought as duplicative, such as "interoffice" discussions among counsel, and two attorneys attending depositions, mediation, and trial.  However, the Court finds nothing "duplicative" with regard to having two lawyers represent Plaintiff, or for two of Plaintiff's attorneys to bill for their time spent in interoffice discussions about the case.

Nonetheless, after carefully examining the billing records, the Court concludes that a very modest adjustment of the total amount requested is in order.

Plaintiff seeks compensation for the drafting and filing of Plaintiff's First Amended Complaint which added Elliott-Larsen Civil Rights sex and pregnancy discrimination claims to Plaintiff's Complaint.  However, Plaintiff was not a "prevailing party" on the ELCRA claims, nor did she prevail on her Title VII claim.  In fact, she did not oppose the dismissal of those claims in opposing Defendant's motion for summary judgment.

Moreover, counsels' billing records after the filing of the Amended Complaint do not segregate out the time spent on the sex and pregnancy discrimination claims as opposed to the FMLA claim upon which she ultimately prevailed at trial.

At the hearing on this matter, Plaintiff's counsel argued that no reduction should be made because of the failure to prevail on the Title VII or ELRCA claims.  She claims that very little time was spent in discovery on these claims -- she represented that she only propounded a few interrogatories directed at the civil rights claims and asked a few questions directed at those claims at Mr. Lively's and Plaintiff's depositions.  She stated

21

she also spent a few hours attempting to track down two witnesses who could support the discrimination claims.  Although the ELRCA claims were included in Plaintiff's Amended Complaint, after finding scant support for the claims during discovery, the decision was made to abandon those claims.  As a consequence, Plaintiff did not oppose Defendant's motion for summary judgment on the Title VII  and ELRCA sex and pregnancy discrimination claims.

Nevertheless, the Court finds that some reduction of fees from July 2011 through June 2012 (i.e., the date filing of the Amended Complaint through the date of filing Plaintiff's response to Defendant's motion for summary judgment) should be made to reflect Plaintiff's failure to prevail on all counts.  Reductions in time are particularly appropriate where, as here, billing records do not segregate the work done on each specific claim and block billing is used instead. *See, e.g.,  Auto Alliance Int'l v. U.S. Customs Serv.*, 155 F. App'x. 226, 228 (6th Cir.2005) (affirming 25% overall reduction for excessive and block billing); *Gratz v. Bollinger*, 353 F. Supp. 2d 929, 939 (E.D. Mich. 2005) ("As a result of such 'block billing,' the Court is not able to determine the number of hours expended on each discrete task. Thus, the Court cannot determine whether the number of hours billed are reasonable.").

Although the above-cited cases indicate the appropriateness of a 25% block reduction for a matter fully litigated through summary judgment, in this case, the Court concludes that such a large reduction is not warranted.  In light of the evidence and

testimony presented on this matter, the Court concludes that a 10% reduction of the amount requested for fees (i.e., $8,581.50) would be reasonable under the circumstances. Therefore, Plaintiff will be awarded attorneys' fees in the total amount of $77,233.50.

C.     COSTS

Plaintiff has also requested reimbursement of the costs incurred by her attorneys, which is contemplated under 29 U.S.C. § 2617(a)(3).  Courts generally refer to 28 U.S.C. § 1920 to determine taxable costs in FMLA actions. *See, e.g., Bell, supra*, 784 F. Supp. 2d at 791-92; *Hyldahl v. AT & T*, 2009 WL 2567197 at *4 (E.D. Mich. Aug. 17, 2009).

Section 1920 provides as follows:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title; and

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

*Id.*

Plaintiff requests costs in the amount of $4,228.43.  Although most of the costs Plaintiff seeks should be awarded, Defendant asks the Court to reduce that sum by disallowing $1,810 for costs expended in mediation and in the preparation of an "exhibit board" for trial.

The "exhibit board" was used during trial and the Court finds this well within the costs allowed under § 1920(3) and (4).  As for the costs expended in mediation, as the Sixth Circuit made clear in allowing costs for focus groups, mock trials, jury-selection services *and* mediation in *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 827 (6th Cir. 2013), the test is whether such services for which reimbursement of costs is sought "conferred a benefit to the prevailing party by helping produce a favorable result."  *Id.* (citation omitted).  The Court has some discretion in awarding costs.  *Id.*  Moreover, Defendant's counsel agreed at the hearing on this matter that mediation proved to be very helpful to the parties.  Under these circumstances, the Court finds it reasonable to tax mediation costs.

Therefore, the Court will award Plaintiff costs in the amount of $4,228.43, i.e., the full amount of costs requested.

D.   PRE- AND POST-JUDGMENT INTEREST

(1)   Pre-Judgment Interest

Pre-judgment interest "at the prevailing rate" is mandatory under 29 U.S.C. §

2617(a)(1)(A)(ii).   *Killian v. Yorozu Automotive Tenn., Inc.*, 454 F.3d 549, 558 (6th Cir.

2006). The term "prevailing rate," however, is not defined in the statute, and the

determination of this rate in any given case is committed to the discretion of the Court.

*United States v. City of Warren*, 138 F.3d 1083, 1096 (6th Cir. 1998); *Bell v. Prefix, Inc.*,

500 F. App'x 473,  474 (6th Cir. 2012) ("The statute does not define 'the prevailing rate,'

and trial courts have exercised their discretion to find different methodologies of

calculation in different contexts." *Id.* (citation omitted));  *see also Neel v. Mid-Atlantic of*

*Fairfield, LLC*, 2012 WL 3264965 at *12 (D.Md. Aug. 9, 2012) (quoting *Quesinberry v.*

*Life Ins. Co. of N. Am.,* 987 F.2d 1017, 1031 (4th Cir. 1993) ("The rate of pre-judgment

interest for cases involving federal questions is a matter left to the discretion of the

district court.")

In the Sixth Circuit, courts generally use the state statutory rate in calculating pre-

judgment interest in FMLA cases. *See e.g., Finnerty v. Wireless Retail,* Inc., 2009 WL

2568555 at *3 (E.D. Mich. Aug. 18, 2009); *Hyldahl v. AT&T, supra*, 2009 WL 2567197

at *5; *Thom v. American Standard, Inc.*, 2009 WL 961182 at *6 (N.D. Ohio, Apr. 29,

2009) ("'To determine the prevailing rate, federal courts rely on applicable state law, as

the rate is not addressed by federal statute.'" *Id.* (quoting *United Steelworkers of Am. v.*

25

*Roemer Indus*, 68 F. Supp. 2d 843, 849 (N.D. Ohio 1999)); *Verhoff v. Time Warner Cable, Inc.*, 2007 WL 2815216 (N.D. Ohio Sept. 26, 2007).  *Cf., Kllian v. Yorozu Automotive Tenn., Inc.*, 2006 WL 3694488 at *5 (E.D. Tenn. Nov. 6, 2006) (finding use of section 1961(a) post-judgment rate appropriate).[2]  Using the Michigan statutory judgment interest rate as set forth in M.C.L. § 600.6013(6)[3] and as provided in the Michigan Money Judgment Interest Rate Table, available at http://www.michigan.gov/treasury/0,4679,7-121-1557-107013--,00.html, Plaintiff seeks an award of pre-judgment interest in the amount of $4,929.71.[4]  Defendant does not

---

[2] The federal courts are not uniform in their approach to pre-judgment interest. "'While there is a plethora [of] circuit court cases holding that district courts have wide discretion on the issue of prejudgment interest -- including what rate to use and how to calculate it -- there is a surprising lack of consensus on exactly what rate to use and exactly how to apply it.'" *Lusk v. Virginia Panel Corp.*, 2014 WL 3900325 at *5 (W.D. Va. Aug. 11, 2014) (quoting *Staples v. Parkview Hosp., Inc.*, 2010 WL 780204, at *11 (N.D. Ind. Mar. 3, 2010)). District courts have variously utilized (1) the state statutory rate, (2) the IRS prime rate, and (3) the federal post-judgment interest rate set by 28 U.S.C. § 1961, and have also differed in the manner of application of those rates.  *See Bell v. Pfizer, Inc., supra*, 500 F. App'x at 474 (listing district court decisions from the Sixth, Seventh, and Eighth Circuits applying each of the different methodologies).

[3] M.C.L. § 600.6013(6) provides:

[I]nterest on a money judgment recovered in a civil action shall be calculated at 6-month interals from the date of filing of the complaint at a rate of interest which is equal to 1% plus the average interest rate paid at auctions of 5-year United States treasury notes during the 6 months immediately preceding July 1 and January 1, as certified by the state treasurer, and compounded annually, pursuant to this section. . . .

[4] This was the amount of accrued pre-judgment interest requested by Plaintiff as of February 18, 2015, the originally scheduled date for the hearing on Plaintiff's post-trial motion.  Using Plaintiff's method of calculation, the amount as of April 24, 2015,

object to the use of the Michigan statutory rate.[5]

Plaintiff arrived at her requested amount of pre-judgment interest amount by multiplying the applicable rates of interest in the Michigan Money Judgment Interest Table for the periods of time from the date of the filing of the Complaint through the date of entry of Judgment times *$62,000*, i.e., the total amount of damages awarded by the jury ($31,000), *plus* liquidated damages in an amount equal to that sum, (i.e., an additional $31,000).[6]

_____

i.e., the date this Opinion and Order and Judgment, would be $5,235.60.

[5] Defendant does, however, object to Plaintiff's method of calculation and the resulting amount of pre-judgment interest yielded by Plaintiff's calculation method.

[6] As set forth in Plaintiff's Ex. 6, Plaintiff calculated the amount of pre-judgment interest for each of the six-month periods since the filing of her Complaint as follows:

```
[7/29/2011 - 12/31/2011]
$62,000 x .03007 = $1,864.34/12 = $155.36/month x 5 months     = $776.80
                   $1,864.34/365 = $5.11/day x 2 days          =  $10.22
[1/1/2012 - 6/30/2012]
$62,000 x .02083 = $1,291.46/12 = $107.62/month x 6 months     = $645.72
[7/1/2012 - 12/31/2012]
$62,000 x .01871 = $1,160.02/12 = $96.67/month x 6 months      = $580.01
[1/1/2013 - 6/30/2013]
$62,000 x .01687 = $1,045.94/12 = $87.16/month x 6 months      = $522.96
[7/1/2013 - 12/31/2013]
$62,000 x .01944 = $1,205.28/12 = $100.44/month x 6 months     = $602.64
[1/1/2014 - 6/30/2014]
$62,000 x .02452 = $1,520.24/12 = $126.69/month x 6 months     = $760.14
[7/1/2014 - 12/31/2014]
$62,000 x .02622 = $1,625.64/12 = $135.47/month x 6 months     = $812.82
[1/1/2015 - 2/18/2015]
$62,000 x .02678 = $1,660.36/365 = $4.55/day x 48              = $218.40
                                             Total:    $4,929.71
```

However, both courts within and outside of the Sixth Circuit agree that pre-judgment interest is to be calculated only on the actual amount of lost wages, salary, benefits or other compensation.  For example, in *Alcazar-Anselmo v. City of Chicago*, 2011 WL 3236024 (N.D. Ill. July 27, 2011), the jury awarded plaintiff $75,000 in compensatory damages. Using the interest rates approved by the Seventh Circuit, the court calculated the pre-judgment interest award based only on the amount of compensatory damages awarded by the jury.  After performing the calculation, the court determined that "the proper interest on compensatory damages [to be awarded to plaintiff] is $14,476l.17."  *Id.* at *5.  *See also Williams v. Illinois Department of Corrections, supra*, 2007 WL 2316476 at * 1, 4 (after jury rendered verdict for lost wages and benefits in the amount of $22,000, the court calculated pre-judgment interest on that amount to be $2,277.87 and entered a pre-judgment interest award for that amount); *Gudde v. Evergreen Realty Group, LLC*, 2012 WL 1183442 at **2-3 (D. Kan. Mar. 10, 2012) (awarding plaintiff compensatory damages for lost wages and benefits in the amount of $100,791.60 and finding that Plaintiff was entitled to pre-judgment interest calculated at ten per cent compounded annually on that sum for a pre-judgment interest award in the amount of $15,622.73); *Newcomb v. Corinth School Dist.*, *supra*, 2015 WL 1505839 at **14-15 (finding plaintiff entitled to pre-judgment interest on his back pay award); *Firth v. Don McGill of West Houston, Ltd., supra*, 2006 WL 846377 at *4

(plus $4.55/day each day after 2/18/15)

[*See* Plaintiff's Ex. 6, Dkt. #58-7]

28

(finding that plaintiff was entitled to pre-judgment interest on back pay award); *Finnerty,*

*supra*, 2009 WL 2568555 at *3 (awarding pre-judgment interest on plaintiff's economic

damage award). Here, as indicated, the jury determined that the amount of Plaintiff's

damages was $31,000.00. Therefore, pre-judgment interest will be calculated based only

on that sum. Using the same Michigan Money Judgment Interest Table used by Plaintiff,

the Court determines that amount of pre-judgment interest that will be awarded through

the date of entry of Judgment is $2,617.90, i.e., just about one-half the amount of pre-

judgment interest Plaintiff requested. Therefore, the Judgment in this case will reflect an

award of compensatory damages in the amount of $31,000 plus an award of pre-

judgment interest in the amount of $2,617.90.

> The Amount of Pre-Judgment Interest Must Also Be Added to the Amount
> of Damages Awarded by the Jury, and that Total Sum Doubled for an
> <u>Award of Liquidated Damages</u>

As indicated above, the Court has determined that Plaintiff is also entitled to an

award of liquidated damages. As numerous courts have determined, the calculation of

the amount of liquidated damages requires not merely a doubling of the amount of the

compensatory damages award, but a doubling of the *sum* of the amount damages awarded

by the jury *plus* pre-judgment interest. *See e.g., Newcomb, supra*, ("Consistent with th[e]

finding [that the defendant failed to demonstrate that its actions were in good faith] and

exercising any discretion in accordance with the strong presumption of liquidated

damages, *the jury's award of back pay and Court's assessment of prejudgment interest*

*are hereby doubled*."  2015 WL 1505839 at *16 (emphasis added)); *see also Neel v. Mid-Atlantic of Fairfield, LLC, supra*, ("Employees who have been unlawfully terminated under the FMLA are entitled to an additional award of liquidated damages equal to the sum of the amount awarded for damages and the interest on that amount."  2012 WL 3264965 at *12); *Hernandez v. Bridgstone, supra*, 2015 WL 1600595 at *1 (employer who violated the FMLA is liable to the affected employee for lost wages, interest, and an additional amount as *liquidated damages equal to the sum of lost wages and interest*); *Wai v. Federal Express Corp.*, 461 F. App'x 876, 886 (11th Cir. 2012) (holding that under the FMLA liquidated damages are to be awarded in an amount equal to the amount awarded for past losses and the interest thereon); *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 302-03 (4th Cir. 2009) (holding that the district court erred in not including pre-judgment interest as part of the damages award, and accordingly also erred in failing to include pre-judgment interest in its calculation of liquidated damages:  "Our decision that Dotson is entitled to pre-judgment interest...requires that we vacate the award of liquidated damages and return it to the district court for recalculation after the addition of pre-judgment interest."  *Id.* at 303); *Alcazar-Anselmo supra*, 2011 WL 3236024 at **5-6 (holding defendant liable for $89,476.17 in liquidated damages -- an amount equal to the $75,000 awarded by the jury plus pre-judgment interest on the jury award in the amount of $14,476.17).

Guided by the above-cited authorities, the Court concludes the pre-judgment

30

interest amount of $2,617.90 should be added to the $31,000 awarded by the jury,

yielding a total liquidated damages award in the amount of $33,617.90.[7]  This amount of

liquidated damages will also be reflected in the Judgment.

(2)    Post-Judgment Interest

Plaintiff also requests post-judgment interest at the rate of $4.55 per day for each

day after February 18, 2015.  Plaintiff arrived at this daily post-judgment interest rate

using the same Michigan Money Judgment Interest Table used in calculating pre-

judgment interest.  Use of the Michigan rate in calculating post-judgment interest is not

appropriate in this federal case.

28 U.S.C. § 1961 governs interest on money judgments obtained in the federal

district court.  As set forth in subsection (a) of § 1961, "Such interest shall be calculated

from the date of entry of the judgment, at a rate equal to the weekly average 1-year

constant maturity Treasury yield, as published by the Board of Governors of the Federal

---

[7]  Using this method of calculating liquidated damages, the net result in the total award of damages and interest differs by only twenty cents from the total  amount of damages and interest calculated by Plaintiff using her calculation of pre-judgment interest.

As noted above, Plaintiff calculated damages and pre-judgment interest as follows: $31,000 damages awarded by the jury plus another $31,000 as liquidated damages, for a total damages award of $62,000, plus pre-judgment interest on that total amount through the date of entry of Judgment in the amount of $5,235.60, yielding a total of **$67,235.60**.

The Court's calculation, using the generally accepted method of computing FMLA awards of damages and interest, results in an award as follows:  $31,000 damages awarded by the jury, plus pre-judgment interest on that amount, i.e., $2,617.90, for a total of $33,617.90, plus an amount equal to that total sum as liquidated damages (i.e., an additional $33,617,90), yielding a total of damages and pre-judgment interest **$67,235.80**.

Reserve System, for the calendar week preceding."  28 U.S.C. § 1961(a).  *See also*

*Alcazar-Anselmo v. City of Chicago, supra*, 2011 WL 3236024 at *6 ("Plaintiff's

compensatory damages, prejudgment interest and liquidated damages add up to

$178,952.34.  Defendant is also liable to Plaintiff for post-judgment interest on this

amount at a rate of 0.252 percent as provided by 28 U.S.C. § 1961.")

The Court takes notice that the published rate for the week ending April 17, 2015

was 0.23%.  *See* http://www.federalreserve.gov/releases/h15/current (available via link

on the United States Courts website, http://www.uscourts.gov/formsandfees/

Fees/PostJudgmentInterestRates.aspx).  Plaintiff shall be entitled to post-judgment

interest in this case at that amount.[8]

## CONCLUSION

For all of the reasons set forth in this Opinion and Order, and for the further

reasons stated by the Court on the record on March 30, 2015,

IT IS HEREBY ORDERED that Plaintiff's Motion for Liquidated Damages,

Attorney Fees, Costs and Interest **[Dkt. # 58]** is GRANTED, as follows:

IT IS HEREBY ORDERED that, in addition to the **$31,000.00 compensatory**

**damages** awarded by the jury on November 10, 2014, Plaintiff shall be awarded **pre-**

**judgment interest in the amount of $2,617.90**, and **liquidated damages** in the amount

of **$33,617.90**, for a total award of compensatory damages, pre-judgment interest, and

---

[8] This post-judgment interest award will be calculated on the total amount of
damages, including pre-judgment interest and liquidated damages.

liquidated damages in the amount of **$67,235.80.**

IT IS FURTHER ORDERED that Plaintiff shall also be awarded attorneys' fees in the amount of **$77,233.50** and costs in the amount of **$4,228.43**, for a total award of fees and costs in the amount of **$81,461.93**.

IT IS FURTHER ORDERED that Plaintiff shall also be awarded **post-judgment interest at the rate of 0.23%** as provided in 28 U.S.C. § 1961.

Let Judgment be entered accordingly.


s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  April 27, 2015

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 27, 2015, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135